First case is Olivera v. Quartet Good morning, Your Honors. May it please the Court. The purpose of the District Court is that it focused on the amended Certificate of Incorporation to the exclusion of all other documents issued in connection with this offering. Yes, the certificate is a contract between the corporation and the shareholders, but so is the contemporaneously filed prospectus pursuant to which the shareholders showed their assent by purchasing the Quartet's shares. Isn't it usually thought that a prospectus is an invitation, essentially, to make an offer? It's like an advertisement, isn't it? But there's case law in Delaware holding that the prospectus is actually the offer. Under certain circumstances. And in this case, it was a contemporaneously filed document. Indeed, the closest case involving a blank check company is the Ruffalo case in Delaware. And in that case, the Court held and stated the charter, the registration statement, and the trust agreement specify the procedures that Transtech was to follow the time of the IPO and the time it either consummated a business combination or was dissolved and liquidated. This amended Certificate of Incorporation did not have a tender requirement, right? It did not explicitly have a tender requirement, but it said demand, and it also, the Certificate of Incorporation specifically referred to the proxy materials. I know that's your argument, but I had a follow-up question. Do some Certificates of Incorporation include a tender component to it? I have not seen one, Your Honor. Are you aware of any? I'm not aware of any, Your Honor. Didn't the prospectus specifically indicate that normally there is not this? I mean, I don't think the question is a tender requirement. The question is the timing of the tender requirement, isn't it? I agree. And didn't the prospectus specifically say that that was a departure from what is the usual process in this kind of company? It was one of those some do, some don't. In this case, they said we'll specify in the proxy materials whether that tender is going to be required, because in this instance, in order for the corporation to fully comprehend who was converting into cash and who was not converting into cash, they wanted the shares tendered prior to the shareholders' meeting. Didn't the prospectus sort of indicate that this was really a substantive change, that it was in order to prevent people from having a certain window for speculation? Well, it was really the term convert, the definition of convert is an exchange of one property for another. But that doesn't say when the exchange has to take place. That's true. So long as someone says, I want to exercise this right, the actual exchange could come at any time, theoretically. It could, and in this instance, because the proxy said you'd get, you'd receive further instructions in the, because the prospectus said you'd receive further instructions in the proxy, they were all part of the mechanical aspect of this transaction. It basically, delivery is required under Delaware law in order to complete the purchase of a piece of stock. Under the time of delivery. You seem to suggest in your reply brief that the timing of delivery is also required by Delaware law. That's not true, right? The timing is not required, but delivery is required, and in this instance, the prospectus said you'll receive further instructions. The prospectus, which clearly is a contract between the corporation and the shareholders, just like is stated in the Ruffalo decision, and the timing was stated. And in other words, here— But the timing and the perspective is kind of permissive. We may require public stockholders who wish to convert their shares of common stock. So it was forward thinking. It wasn't, you have to do this. So where's the contract in we may require? Well, the contract, there's nothing inconsistent between the delivery requirement prior to the shareholders meeting and the certificate of incorporation and the prospectus. The certificate of incorporation is silent, although it does specifically refer to the proxy materials. The prospectus says, we'll tell you whether you're going to have to deliver the shares, and it's the when. And the when is the mechanical aspect of— Well, it's just the mechanical aspect of it. Suppose I agreed with you that this was in fact a, the prospectus is a contract, and the prospectus does give you the right to include instructions of this kind of detail in the proxy statement, and that Mr. Oliveira, in fact, breached the contract by not tendering in time. Why is that such a material breach that it would excuse your performance of the substance of the right to convert? Well, it's not that it's a material breach. It's in contradiction of the instructions that were issued. And it's just like the judge focused at the beginning of the argument below when he said the prospectus doesn't, and the certificate of incorporation doesn't say you have to fill out the proxy card, but that's contained in the proxy materials. But suppose it said it has to be there by noon of the day before the shareholders' meeting, and it got in at 12.15. That would mean that you don't have to comply with the substantive obligation to do the conversion? Based on the proxy materials, the proxy statement, and the clear instructions in the proxy statement. The proxy statement is set for three requirements. You have to vote yea or nay, you have to fill in the box, and then you have to deliver your shares before the shareholders' meeting. That doesn't deprive anyone of a right. It's to exercise that right, deliver the shares. And that's consistent with Delaware law, and it's consistent with both the certificate of incorporation and the prospectus. There's nothing inconsistent in requiring that act. There's nothing inconsistent, but why is there no forgiveness if the substance of the right is that when you buy these shares, you have this right to do a cash conversion? And you're saying, well, and it makes sense to me that there could be mechanical requirements. You have to check the box on the proxy statement. You're not supposed to just write on the proxy statement, I hereby exercise my right. You know, well, okay. You can do that to make things clear and orderly, but why the strict compliance requirement with something that you keep telling us is just mechanics? Because the certificate of incorporation contained a provision D, which said the corporation will not consummate any business combination unless it has net tangible assets of at least $5,000,001 upon consummation of such business combination. In order to make that determination, in order to see if it was going to go forward, they needed to know a lot of these shares were in street name. So unless they were delivered prior to the shareholder's meeting, there was no way of knowing whether the business combination would go forward. And the other aspect of this, which- Why is that? If he checks the box, isn't he obligated to go forward with the conversion? Not according to Judge Rakoff's decision, not according to the statements he made. He was still trying to see if he could sell it for higher than 1020 after he had checked the box. When he sent the notice to his broker on September 30th, he said, you know, I want to sell these shares if I can get more than 1020. So that creates the confusion that this provision is trying to avoid. Thank you, Mr. Kelsey. You've reserved a couple of minutes. Thank you. We'll hear from Mr. Licker. May it please the Court, Eugene Licker, Ballard Spar for Steve Oliveira, Appellate. There is a fundamental disconnect in appellant's argument. Primarily in the brief, I didn't hear much of it in oral argument, but the disconnect is in this election year, I'm trying not to use the word hugely, massively important. The disconnect is that appellant claims that the restriction at issue here was the requirement that you deliver the stock, and therefore that Judge Rakoff's decision was that a requirement of delivery of stock upon conversion has to be set forth in the Certificate of Incorporation. Appellants then say Mr. Oliveira didn't tender his stock, and therefore he should have tendered the stock in order to convert. That is all wrong, and the error is manifest. First of all, it is, as Your Honors have pointed out, the requirement isn't that you deliver the stock. The requirement isn't that you prove that you own the stock. I have no problem with that requirement. The requirement is that you deliver the stock at or before the meeting, and it is massively important that that difference occurred. That is what was before Judge Rakoff. That is what Judge Rakoff said needed to be in the Certificate of Incorporation, and the reason it needed to be in the Certificate of Incorporation is because it is a limitation, qualification, or restriction on the rights of stockholders, and Delaware law could not be clearer. Irrespective of all the nice argumentation you heard about contract law, Delaware law, Section 151A could not be clearer. When you have a restriction, qualification on the rights of stockholders, that must be set forth in the Certificate of Incorporation. I am not saying, Mr. Oliveira is not saying that you can't say that you have to tender on or before the meeting, but if you're going to make that requirement, you have to set forth that requirement in the Certificate. When you asked your co-counsel, have you ever seen a certificate with that limitation? Have you ever seen it? I have not, no. But I wouldn't. I'm just a litigator. When did he tender the shares? On October the 3rd. Is there any proof of that? Yes, there is. Indeed, it's interesting. It's A314. It happens to be the same Merrill Lynch statement that appellants rely on to urge this Court that the Pangea stock was delivered to Mr. Oliveira. And what they don't point out is that the adjacent transaction shows the Quartet stock being exchanged out. I'm on A314. Where does it say that? That's his broker's statement to your client, right? And that's from Merrill Lynch, right? That's correct. So you see it says under that, it says 10-3, same date, Quartet Merger Corp., paydate 10-3-2014, exchange minus 175. So that shows that he actually—how does that show he tendered the stock? Well, it went somewhere. I mean, it may have gone into the miasma, but it went somewhere. Doesn't that show—I mean, that's the two related transactions, right? That's correct. So that's what they did, isn't it? Didn't they sort of automatically transfer the shares from one type to the other? I don't think it mattered. Yes. It's actually a little bit more complicated than that. I'm sorry? Quartet didn't exist anymore. That's exactly correct. So I'm having trouble saying, you know, how does he tender the shares? He wants to tender the shares and get money. They want to give him new shares in the name of Pangea. It seems like the latter is what happened. Well, but he no longer has his shares in the account. I share your confusion, and— My question was, where is the evidence, though, that he tendered the Quartet shares to Pangea before October 9th? The evidence is the account statement. That's the only evidence. As I said to Judge Rakoff, it's not like when I was a young associate and he was the head of the Securities Fraud Unit in the U.S. Attorney's Office, when we had nice pieces of paper that, you know, we could hand across the transom. That doesn't exist anymore. You don't actually tender anything. I'm e-mailing—I'm e-mailing my stockers something. No. There's nothing to e-mail. Nobody ever does that. I can't speak to what it, you know, ever, but that's just not the way it's done anymore. It's all done electronically. And— But what's done electronically, I mean, where is the evidence that what was done electronically was at his initiative rather than something that happens like a stock split where Merrill each share was worth—each worth half as much as yesterday because they did a stock split rather than I instructed Merrill Lynch to sell these shares or give them back or do something else? I don't mean this to be as flippant as it's going to sound, but I don't think it matters. It doesn't matter for two reasons. First of all, what's—what this— Well, I mean, it certainly explodes the argument that we didn't hear at oral argument today, but that is all over your opponents' briefs, that somehow it's absolutely necessary because otherwise they don't know who owns the shares or what's going to happen. They managed to switch his shares from Quartet shares to Pangea shares. It seems to me they could just as easily have managed to change his Quartet shares into cash by just whatever process they used. And we've also—we've moved off of the point, and the point isn't that you have to prove that you tendered. The point is you have to prove that you own. Yeah. But I mean, when—all of that hinges on the notion that this is a restriction on the right to—on a substantive right of the shareholder, right? That's what has to be in the certificate. Every detail—I think you sort of conceded this in a way or at least said something I took that way, that some requirements or some rules or some processes could be insisted on. Absolutely. It doesn't say in the shareholder's certificate you have to check a box on the proxy statement. Absolutely. And that's really the second impact of this disconnect. There's nothing wrong with requiring proof of ownership, but what's wrong is this requirement says if you don't do X, which is only one way of proof of ownership, because there's multiple ways, by a certain date, you forever lose the right to tender. And that's the difference. You can't—particularly with a SPAC. Let me ask one thing that comes off your adversary's argument. Mr. Oliveira did say, I think, in his deposition that he was still hoping to sell the shares for more than $10.20 if his prediction, I guess, that the shares would go down turned out to be wrong. Well, it turned out to be right, so that didn't make a difference substantively. But do you think that Mr. Oliveira, if—suppose the stock had gone shooting up on the very first trading day after this merger, does he, having checked that box, is he obligated to turn his shares back for $10.20, or can he sell them to somebody else? Two different things. What they're arguing is that there's some sort of arbitrage on the Quartet stock. So the day after the merger, as I think it was Your Honor pointed out, there was no market for Quartet. Now, in terms of whether you are bound by your notice to convert, and therefore you don't have the opportunity to get Pangea stock, you are bound. You put in a notice. But what happened here is because Pangea was lazy. They wanted to just blanket the rest of the world with Pangea stock. Mr. Oliveira had said, I don't want the Pangea stock, I want money. They gave him the Pangea stock anyway. If they hadn't have done that, then he would not have had Pangea stock to play that arbitrage that you described. It's because of what they did. Okay. So because they exchanged the stock, if the stock had gone, if the Pangea stock was worth more than $10.20, he could have sold that stock and then just not brought this lawsuit, not complained about what they did to or for him, and that would have been how things would have gone. Right. He wouldn't have had a lawsuit to bring. At least I wouldn't have brought it. Right. But you're saying he had, having checked the box, if that Merrill Lynch statement said, in effect, sold $175,000 quartet stock, credited X amount of cash, $175,000 plus $0.20 or whatever it was, 20%, then there would be, he wouldn't be able to make any further trades. Even simpler than that. Had they simply not given him the Pangea stock, and let's say— Because the quartet stock was untradable at that point. Worthless. I call it wallpaper in my brief. And if they hadn't given him the Pangea stock, he would have had nothing to sell. And then when he sends the email saying, where's my money, they would say to him, prove that you own the stock. And then he goes, here's my Merrill Lynch statement. I do own the stock. They'd say, fine. That's not what they said. They said, you didn't meet the deadline, therefore you are out of luck. And this is very important in a SPAC. Because in a SPAC, unless there's some calamity, like a nuclear holocaust, basically you expect one of three things to happen. 18 months comes and goes and there's no deal, in which case you get, you put down your $10, you get back $10.20. Second, whatever period of time, in this case it was a year, comes and goes, you got a, they get a deal that you don't like, you turn it down and you get $10.20. Or third, you do like the deal, in which case you're off to the races. You've got all the risks attended. But they have imposed now a fourth possibility, which is you do everything that the Certificate of Incorporation says you're supposed to do, but you didn't do the thing that we added illegally, because 151A requires it to be in the certificate, you didn't meet our deadline, therefore your investment program is out the window. You don't get to get the money back. You know, they scoff at this as if it's, you know, it's Olivera saying, this is going to be a riskless investment. Well, in many respects it is. That's the amount of time. Thank you, Mr. Licker. Mr. Kellis, you have a couple of minutes. I do. Thank you, your honors. This is the first time that I've heard that Mr. Olivera tendered this stock on October 3rd. In fact, in the brief it says he tendered it on or about October 8th, and if you look at the document that's referred to A381, his email to his broker, to the Pangea people, it does not say that he's tendering the stock. He demands payment without offering to tender the stock. But he has no, he has nothing to tender anymore. Of course he does. He has the Pangea stock at this point. It's an automatic conversion that had occurred. It's an automatic conversion. He didn't, this conversion didn't occur immaculately, it occurred automatically. And at A112, the procedure for delivering the shares to the depository withdrawal custodian is set forth right in the prospectus. It describes the way you're going to do it by tendering the shares. And unless you tender the shares, unless you deliver those shares, there's no way for Pangea to know that they're not required to trade those things. But haven't you already rejected his attempt to convert his failed, what you would consider his failed attempt to convert by just giving you notice without tendering shares, you already did option two rather than option one. You converted the shares to Pangea shares rather than to cash. Because he didn't tender the shares as he was required. Whether he tenders the shares after October 3rd or after the transaction, it seems to me is irrelevant. Your argument is he had to do it before. And if he didn't do it before, you're entitled to reject it and give him Pangea shares instead of giving him $10.27. And understand that the record date in this instance was August 27th. So he had from August 27th until 930, until the shareholders meeting, where he could speculate as much as he wanted. And if the stock was going up, he could have sold it and made a profit. Even though on August 27th, he had said, I'm going to convert the shares to cash. There was no obstacle to that. Thank you, Mr. Kellogg. Thank you. Reserve decision.